Filed 3/9/15

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C074297 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F02676) |
| v. | |
| VINCENT RIVERA et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Allen H. Sumner, Judge. Affirmed in part and reversed in part.

Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant, Vincent Rivera; Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant, Fred Huante.

Kamala D. Harris, Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputies Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I, II, III, V, VI, and VII of the Discussion.

1

This case involves criminal convictions arising from two shootings separated by less than one month, both that were retaliation for stolen drugs. In the second shooting, Francisco (Frankie) Flores was killed. A jury found codefendants Vincent Rivera (the shooter) and Fred Huante guilty of first degree murder for Frankie Flores's death. The jury also found defendants guilty of, among other things, the attempted murders of Michael Flores, Aaron Amaro, and Paul Amaro. Both Rivera and Huante appeal, raising seven contentions.

We reverse Huante's first degree murder conviction pursuant to *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), in which our Supreme Court held "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine." (*Id*. at pp. 158-159.) On remand, the People may either accept a reduction of Huante's conviction to second degree murder or retry the first degree murder charge under a proper theory. (See *id*. at p. 168.)

We reject defendants' other challenges to the judgment. These other challenges relate to trial counsel's effectiveness, the trial court's decisions to excuse a juror and consolidate the two shootings for trial, alleged instructional error, alleged error in allowing Huante's attorney to appear by speakerphone, and cumulative prejudice from the alleged errors. Defendants join in each other's arguments to the extent the joinder benefits them.

FACTUAL AND PROCEDURAL HISTORY

A

*Background For All Charged Crimes*

Rivera and Huante committed the charged crimes as revenge for drugs that were robbed from Huante. The facts behind that robbery were as follows: In late February or early March 2011, brothers Michael Flores and Frankie Flores and others were hanging out in Frankie's 1996 black Chevy Impala near a park, when Huante came up to Frankie

2

Flores and asked if he wanted to buy cocaine. Huante showed Frankie Flores the cocaine, and the two exchanged telephone numbers.

Later, Frankie Flores told Michael Flores they were going to rob Huante of some drugs. They took their mother's Trailblazer because Huante had seen Frankie's black Chevy Impala. Michael Flores drove Frankie Flores and some others in the Trailblazer toward the park. Frankie Flores telephoned Huante, who then showed up with a half ounce of cocaine. Frankie Flores took the cocaine, pointed a gun at Huante, and then Michael Flores drove them away fast. As they fled, Michael Flores heard five gunshots behind them.

## B

*The Attempted Murders Of The Amaro Brothers On March 27, 2011*

On March 27, 2011, Paul Amaro was driving his 1996 black Chevy Impala with his brother Aaron Amaro in the front seat, when Paul heard a "loud noise." Paul Amaro saw a man, whom he later identified as Huante in a photographic lineup, shooting at him and his brother. From a separate lineup, Paul Amaro identified Rivera as the driver of the car Huante was in. He did not know either Huante or Rivera. Paul Amaro had met Frankie Flores at a family party once and realized that they drove identical cars. Aaron Amaro was shot in the leg, had to have surgery, and was on crutches for two to three months.

## C

*The Murder Of Frankie Flores And Attempted*
*Murder Of Michael Flores On April 14, 2011*

On April 14, 2011, Frankie Flores drove himself and his brother Michael Flores in his black Impala to a strip mall. When they got to the strip mall, they stayed talking inside the car. A truck pulled up alongside them, and the driver (whom Michael Flores identified as Rivera) pulled out a gun. Michael Flores told his brother, " 'That dude's got a gun. Start the car. Let's leave.' " Frankie Flores started up the Impala. Rivera hopped

3

out of the truck, went up to the Impala's driver's side window, and asked if the driver was " 'Frankie.' " Frankie said, " 'No. You got the wrong person.' " Rivera called to his passenger in the truck (whom Michael Flores identified as Huante) and asked, " 'Is that him?' " Huante got out of the truck and ran around to the back of the truck. Frankie Flores put his Impala in reverse, and as he did, Rivera started shooting. Michael Flores got shot twice, through the mouth and in the forearm. Frankie Flores got shot six times, including fatal shots to his lung and heart. Frankie Flores died within minutes of being shot. According to Michael Flores, he or his brother did not have a weapon on them or near them at the time of the fatal shooting.

Valentino Hernandez and his mother, Toni Hernandez, saw the shooting while in their car at the strip mall's parking lot. Toni Hernandez heard Rivera say to Huante, " 'Come here. Look at what this mother-fucker has on his lap.' " Later, Valentino Hernandez was talking with his mother and, according to Toni Hernandez, Valentino said, " '[one of the Flores brother's] had a gun on his lap.' "[1] They drove out of the parking lot fast after the shooting started.

A ballistics expert determined that the expended bullets from the March 27 shooting and the April 14 shooting were discharged from the same firearm.

## DISCUSSION

### I

### *Rivera Received Effective Assistance Of Counsel*

Rivera contends his counsel was ineffective for failing to introduce evidence corroborating his self-defense claim. Specifically, he contends counsel should have asked Valentino Hernandez whether he saw or knew that one of the Flores brothers had a

---

[1] The court instructed the jury to consider this statement for Valentino Hernandez's and Toni Hernandez's states of mind and not for the truth of the matter. Rivera testified at trial that passenger Michael Flores had what looked like a gun in his hand.

4

gun in his lap. Defendant's reasoning is as follows: if his trial counsel had asked Valentino Hernandez whether he saw a gun on the lap of one of the Flores brothers and if Valentino had answered "yes," such evidence would have tended to corroborated Rivera's testimony that Michael Flores pulled out a gun. If Valentino denied seeing a gun, defense counsel could have impeached Valentino with his statement to his mother that one of the Flores brothers "had a gun on his lap." We disagree, because counsel had a tactical reason for proceeding the way he did. (See *People v. Frierson* (1979) 25 Cal.3d 142, 158 [a reasonable tactical decision does not constitute ineffective assistance of counsel].)

The evidence on the gun was as follows: It was undisputed at trial that Valentino Hernandez and his mother were in their car during the entire incident. Thus, it was reasonable inference that neither one of them could have seen anything on the laps of the Flores brothers. Moreover, Rivera's defense counsel was aware of the statement Valentino made to his mother, Toni (that " 'he has a gun on his lap' ") and counsel elicited this evidence during his cross-examination of Toni Hernandez. This trial tactic allowed counsel to put the statement before the jury without the possibility that Valentino might have testified in court that he did not see a gun on the lap of anyone in the Flores car. Given the state of the evidence, counsel was not ineffective for proceeding as he did.

II

*The Trial Court Did Not Err In Excusing Juror No. 8*

Rivera and Huante contend the trial court erred in violation of their constitutional rights when it dismissed Juror No. 8 because the record did not establish good cause to excuse the juror, rather than have her continue to deliberate for a day or two more. The court excused Juror No. 8 after she told the court that her employer would not pay her anymore for jury service, which would cause her family financial hardship. The court found "a demonstrable reality that her ability to deliberate fairly [wa]s substantially impaired."

5

" 'We review for abuse of discretion the trial court's determination to discharge a juror and order an alternate to serve. [Citation.] If there is any substantial evidence supporting the trial court's ruling, we will uphold it. [Citation.] . . . [H]owever, . . . a juror's inability to perform as a juror " 'must appear in the record as a demonstrable reality.' " ' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 474.) As we explain, there was no abuse of discretion here. Juror No. 8's inability to perform as a juror was based on substantial evidence in the form of her note to the court, her answers to the court's questions, and the juror's body language demonstrating anxiety at having to serve further.

On the 15th day of trial, the jury retired to deliberate. On the 16th day, Juror No. 8 sent a note to the court stating as follows: "I will not be paid starting tomorrow from work + it will cause a hardship at home financially." Orally, the juror told the court, "we cannot pay the house payment and all of our bills" without both her income and her husband's income. The court then asked Juror No. 8, "If you were serving on the jury after tomorrow, and you're not getting paid by your employer, would it affect your ability to carry out your duties as a juror?" Juror No. 8 responded, "Yes," "[b]ecause I would be constantly thinking about not being able to pay our bills." The court then asked Juror No. 8 to wait outside and described her demeanor as "very tense, nervous, and tightening up as she was explaining her position."

This evidence of financial hardship, which caused the juror mental and physical anxiety and detracted from her ability to focus on the case, was substantial evidence to support the trial court's determination that Juror No. 8 was unable to perform as a juror. Thus, the trial court did not abuse its discretion in excusing her. Because there was no abuse of discretion, the juror's discharge did not violate defendants' constitutional rights. (*People v. Lomax* (2010) 49 Cal.4th 530, 591-592.)

6

## III

### *The Trial Court Did Not Err In Consolidating The Frankie Flores Murder Case With The Attempted Murder Of The Amaro Brothers*

Defendants contend the trial court violated their constitutional rights by consolidating the Amaro shooting with the Flores murder. The trial court granted the People's motion to consolidate because the attempted murder of Amaro brothers and murder of Frankie Flores were the same class of crimes separated by only three weeks and involved the same motive.

Huante's contention on appeal reiterates the arguments of his trial counsel and Rivera's trial counsel as to why the cases should not have been consolidated. These arguments included that there was no duplication of witnesses, the two cases would improperly bolster each other, and they were not really of the same class of crimes.

Rivera's contention focuses on his view that his guilt in the Amaro shooting was "very weak," while his guilt of the Flores shooting was "comparatively stronger," so there was "a danger that the aggregate evidence on the charges altered the outcome of the case."

As we explain below, the court did not err in consolidating the two cases for trial.

Penal Code section 954 provides that "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated." Consolidation of charges is favored. (*People v. Smith* (2007) 40 Cal.4th 483, 510.)

"[M]urder and attempted murder are of the same class of crimes within the meaning of section 954. [Citation.] The statutory requirements for joinder thus being satisfied, defendant ' " 'can predicate error in denying the motion only on a clear showing of potential prejudice. [Citation.] We review the trial court's ruling on the

7

severance motion for abuse of discretion." ' " (*People v. Jones* (2013) 57 Cal.4th 899, 924.) " 'In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, "we consider the record before the trial court when it made its ruling." ' [Citations.] We consider first whether the evidence of the two sets of offenses would have been cross-admissible if the offenses had been separately tried. [Citation.] If the evidence would have been cross-admissible, then joinder of the charges was not prejudicial." (*People v. Thomas* (2012) 53 Cal.4th 771, 798.)

The evidence was cross-admissible. The attempted murder of the Amaro brothers and the Frankie Flores murder were based on the same motive -- revenge for a drug robbery. At the time the trial court was considering the consolidation motion, the state of the evidence as established during two preliminary hearings was as follows: the victims in the Frankie Flores murder case had "ripped off drugs . . . from one of the defendants." Then, "defendants wanted to retaliate. And after that they began looking for the victim." "They saw a vehicle that matched the victim's vehicle and opened up fire on the victim." That victim, one of the Amaro brothers, identified defendants as the shooters. That was the attempted murder case. Two weeks after these attempted murders, defendants see Frankie Flores in the parking lot "driving the exact same car that the attempt[ed] murder victim[s] [i.e., the Amaro brothers] w[ere] driving." Defendants "get into a confrontation at that parking lot, begin yelling that they want their money back. They want their drugs back. And then they end up opening fire on the victims inside that vehicle, which is the murder case. And they end up killing one of the individuals in there." "[T]hose bullets end up being matched up to the attempt[ed] murder just a few weeks before."

Given that the crimes were of the same class and the evidence was cross-admissible, defendants have failed to make a " ' "clear showing of prejudice." ' " (*People v. Thomas*, *supra*, 53 Cal.4th at p. 798.) There was no abuse of discretion.

8

IV

*Huante's First Degree Murder Conviction*

*Must Be Reversed For Instructional Error*

Huante contends his conviction for the first degree murder of Frankie Flores must be reversed because the instructions impermissibly allowed the jury to find him guilty of first degree murder if it found the target crime of the uncharged conspiracy was discharging a firearm at an occupied vehicle and that first degree murder was a natural and probable consequence of that target crime. The impermissibility stems from *Chiu*, in which our Supreme Court held that the most a defendant can be found guilty of in a similar situation (aiding and abetting instructions that allowed a first degree premeditated murder conviction on a natural and probable consequences doctrine) was second degree murder. (*Chiu*, *supra*, 59 Cal.4th at pp. 158-159, 168.) The People do not argue the instructions were correct; rather, they argue the error was harmless beyond a reasonable doubt.

As we explain, there was error under *Chiu* and it was prejudicial.

A

*The People's Theory Of Murder As It Applied To Huante And The Instructions*

The instructions told the jury that Huante was charged with Frankie Flores's first degree murder and Michael Flores's first degree attempted murder based on two

alternative theories: (1) Huante was guilty of those crimes as an aider and abettor[2]; or (2) Huante was guilty of those crimes as a member of an uncharged conspiracy.[3]

As to the uncharged conspiracy theory of first degree murder and attempted murder, the jury was instructed in pertinent part as follows:

"A member of a conspiracy is . . . criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is the natural and probable consequence of the common plan or design of the conspiracy. This rule applies even if the act was not intended as part of the original plan." [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes."

"To prove that the defendant is guilty of the crimes charged in Count One [murder of Frankie Flores] and/or Count Two [attempted murder of Michael Flores], the People must prove that:

"One, the defendant conspired to commit one of the following crimes: murder, attempted murder, robbery, and/or discharge of a firearm at an occupied vehicle;

"Two, a member of the conspiracy committed murder as charged in Count One and/or attempted murder as charged in Count Two to further the conspiracy; and

"Three, murder as charged in Count One, and/or attempted murder as charged in Count Two, were a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit."

---

[2] There was no error in the aider and abettor instructions because, unlike in *Chiu*, here the aider and abettor instructions did not refer to the natural and probable consequences theory of liability. The only instructions that did were the conspiracy instructions.

[3] The prosecutor in closing also argued these two theories as to Huante, noting "there's multiple ways to allow liability in this case -- conspiracy, aiding and abetting." (6RT 1487:17-19)

10

B

*The Error In These Instructions*

Under these instructions, it was possible for the jury to have found Huante guilty of first degree murder if it found the target crime of the uncharged conspiracy was discharging a firearm at an occupied vehicle and that first degree murder was a natural and probable consequence of that target crime.

The error in finding first degree murder under this theory is based on the California Supreme Court's reasoning in *Chiu*, *supra*, 59 Cal.4th 155, holding a defendant who is an aider and abettor cannot be convicted of first degree murder under a natural and probable consequences theory. (*Id*. at pp. 158-159.) The court found that due to the vicarious nature of liability under the natural and probable consequences theory (*id*. at p. 164), "the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved . . ." (*id*. at p. 166). [4]

The error here is similar. As we just explained, the error in *Chiu* was imposing aider and abettor liability for first degree murder under the natural and probable consequences doctrine. The error here is imposing uncharged conspiracy liability for first degree murder also under the natural and probable consequences doctrine. In these contexts, the operation of the natural and probable consequences doctrines is analogous. This analogy appeared in *Chiu* itself, when the court was cataloguing examples of the natural and probable consequences as follows: "The natural and probable consequences

---

[4]    The rationale here applies only to the target offense of discharging a firearm at an occupied vehicle. This is so because if the jury found that the target offense was either murder or attempted murder, that would mean that the conspirators planned to commit murder, amounting to first degree premeditated murder. If the jury found that the target offense was robbery, the murder would be first degree under the felony murder rule.

11

doctrine was recognized at common law and is firmly entrenched in California law as a theory of criminal liability.  ([*People v. *]*Prettyman* [1996]  14 Cal.4th [248, ] at pp. 260-261; *People v. Durham* (1969) 70 Cal.2d 171, 181-185 & fn. 11; . . . cf. *People v. Kauffman* (1907) 152 Cal. 331, 334 . . . [conspiracy liability] . . . .”  (*Chiu*, *supra*, 59 Cal.4th at p. 163.)  Thus, when the California Supreme Court in *Chiu* was explaining the natural and probable consequences doctrine, it understood its applicability to both aiding and abetting and conspiracy theories. **5**

Under both these theories, the extension of liability to additional, reasonably foreseeable offenses rests on the “policy [that] conspirators and aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion.” (*People v. Luparello*, *supra*, 187 Cal.App.3d at p. 439.)  The problem with extending a defendant’s liability for a first degree premeditated murder to an aider and abettor (and we hold also a co-conspirator) under the natural and probable consequences doctrine was explained in *Chiu* in pertinent part as follows:

“First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty.  [Citation.]  That mental state is uniquely subjective and personal.  It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death.  [Citations.]  Additionally, whether a direct perpetrator commits a nontarget offense of murder with or without premeditation and deliberation has no effect on the resultant

---

**5**      The difference in the two theories of liability is that “the conspirator need only intend to agree or conspire and to commit the offense which is the object of the conspiracy [citation]; while the aider and abettor must intend to commit the offense or to encourage or facilitate its commission.” (*People v. Luparello* (1986) 187 Cal.App.3d 410, 439; see also *People v. Smith* (2014) 60 Cal.4th 603, 616-617.)

harm. The victim has been killed regardless of the perpetrator's premeditative mental state. Although we have stated that an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [citation], the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above stated public policy concern of deterrence." (*Chiu*, *supra*, 59 Cal.4th at p. 166.)

Given these reasons articulated by the California Supreme Court for limiting aider and abettor liability under the natural and probable consequences doctrine to second degree murder and the analogy between aiding and abetting and conspiracy that we have explained, we hold that the trial court here erred in instructing the jury it could reach a verdict of first degree murder for Huante if it found that the target crime of the uncharged conspiracy was discharging a firearm at an occupied vehicle and that first degree murder was a natural and probable consequence of that target crime.

C

*The Instructional Error Was Prejudicial; The Remedy Is To Reduce Huante's Conviction*
*To Second Degree Murder Or Remand For Retrial On First Degree Murder*

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.] Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory . . . . [Citation.] We cannot so conclude." (*Chiu*, supra, 59 Cal. 4th at p. 167.)

The record shows that the jury may have based its verdict of first degree premeditated murder for Huante on the natural and probable consequences theory. During deliberations, the jury sent the trial court a note asking, "If Vincent Rivera is found guilty of the murder of Frankie Flores, and if Fred Huante is found to be a[n]

13

aider/abettor and/or co-conspirator in the murder of Frankie Flores, is Fred Huante guilty of the same level of murder (1st degree, 2nd degree) as Vincent Rivera?" The court referred the jury back to the instructions it had given previously on these areas, including the erroneous instructions we have discussed above.

The People argue the error was harmless because "[b]y returning a guilty verdict on the attempted murder count [count two], the jury found that Huante intended to kill Michael Flores, and he also possessed the require mens rea for first degree murder. Once the jury found the necessary intent to commit murder, along with premeditation and deliberation, the . . . instructional error was harmless . . . ."

The People's argument is refuted by the following instruction (CALCRIM No. 601 as modified) regarding deliberation and premeditation as it applied to Huante: "As to defendant Fred Huante, the attempted murder was done willfully and with deliberation and premeditation *if either* the defendant Fred Huante *or* defendant Vincent Rivera or both of them acted with that state of mind." (Italics added.) Thus, the jury's guilty verdict on the first degree attempted murder of Michael Flores (count two) as to Huante may have meant nothing more than the jury found *Rivera* acted with deliberation and premeditation, and that Rivera's deliberation and premeditation was imputed to Huante pursuant to this instruction. It did not mean, as the People claim, the jury necessarily found that Huante personally premeditated a killing on April 14.[6]

And, nothing about the guilty verdict in count two, on which the People place all their reliance, indicates the jury used the correct aiding and abetting theory rather than the flawed conspiracy theory, to find Huante guilty of the first degree premeditated murder of

---

[6] There was no other pertinent instructions that applied to Huante for the finding of requisite intent to kill for count one (the murder of Frankie Flores) and two (the attempted murder of Michael Flores) that took place on April 14, 2011, other than this one and the erroneous conspiracy instruction we have already discussed.

14

Frankie Flores in count one. The verdict in count two could have been based on a jury finding that Huante was a coconspirator in the shooting into an occupied motor vehicle and that attempted murder was a natural and probable consequence of that target crime. If the jury so found, and then found that Rivera acted willfully and with deliberation and premeditation in perpetrating the attempted murder in count two (pursuant to CALCRIM No. 601 as quoted above), the same instruction required the jury to apply that finding of premeditation to Huante as well.

We turn then to the remedy. Because "the court's instructional error affected only the degree of the crime of which [defendant] was convicted," we " 'may reduce the conviction to [the] lesser degree [of the offense] and affirm the judgment as modified, thereby obviating the necessity for a retrial,' " but at the same time we must " 'give the prosecutor the option of retrying the greater offense, or accepting [the] reduction to the lesser offense.' " (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1596; see also *People v. Hart* (2009) 176 Cal.App.4th 662, 674-675.) Accordingly, that is what we will do.

V

*The California Supreme Court Has Upheld The Practice Of Allowing*

*An Uncharged Conspiracy To Be The Basis For Criminal Liability*

Huante contends the trial court erred in instructing the jury that it could use a theory of uncharged conspiracy to find him guilty of murder in count one and attempted murder in count two because uncharged conspiracy is not a valid theory of criminal liability under California law.

The California Supreme Court has rejected this argument: "Our decisions have 'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a

15

conspiracy theory [citations]." [Citation.]' " (*People v. Valdez* (2012) 55 Cal.4th 82, 150.) As Huante recognizes, we are bound by the decisions of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

VI

*Huante Has Forfeited His Claim That He Was Deprived Of His Right To*
*Counsel By The Representation Of His Trial Counsel Via Speakerphone*
*From Deliberations Onward; The Alleged Error Was Not Structural*

Huante contends that the trial court violated his federal and state constitutional rights to counsel when the court allowed his trial counsel, Joel Deckler, to appear by speakerphone from deliberations onward. Huante's contention focuses specifically on one part of the speakerphone representation: the hearing regarding whether the court should excuse Juror No. 8. Huante claims for the first time on appeal that "the speakerphone setup was inadequate" because "[i]t did not permit Deckler to hear answers given by the witness," "Deckler was unable to hear comments made by counsel for co-appellant Rivera," and "[Deckler] could not personally participate in a sidebar conference, but was forced to rely on [co-counsel] Mr. Whisenand." Huante asserts, "the defective speaker-phone system created a situation that amounted to an outright denial of counsel at the hearing."

A

*Factual Background Regarding The Speakerphone Representation*

After discussing jury instructions, trial counsel Deckler told the court the following: "Mr. Huante is aware that I am retiring at the end of this trial. I will be available by way of phone for any jury questions and any input that I can have with the Court and co-counsel [Alan Whisenand]. [¶] [Kyle] Knapp [counsel for Rivera] has graciously consented to stand in at anytime when the jury will be present in the room." Trial counsel Deckler added that if the jury found Huante guilty, the court could either relieve Deckler and appoint another attorney or, alternatively, Deckler could remain as

16

counsel and appear telephonically with a second attorney meeting with Huante to discuss the probation report and appear in the courtroom at judgment and sentencing. Trial counsel Deckler asked Huante if either option would be satisfactory, and Huante responded, "Yeah."

Later, during deliberations, trial counsel Deckler appeared telephonically with cocounsel Whisenand appearing in person during the hearing on whether Juror No. 8 should be excused. Trial counsel Deckler stated he preferred to use a landline, rather than a speakerphone, to talk with cocounsel Whisenand, and that Whisenand could convey Deckler's thoughts to Huante. Huante responded, "Yes," when asked if he consented to this procedure.

When the court questioned Juror No. 8, trial counsel Deckler told the court he could not hear much of what the juror had said. The court then repeated what Juror No. 8 had said. Juror No. 8 then continued responding to questions and, whenever trial counsel Deckler could not hear what she had said, he so noted and the court repeated her answers. At one point, just after a sidebar conference, cocounsel Whisenand told trial counsel Deckler, "I believe I represented your position accurately at sidebar when we approached." Trial counsel Deckler responded, "I'm sure you did since we previously discussed this whole issue."

B

*Huante Forfeited His Claim By Failing To Object In the Trial Court*

Huante explicitly agreed to the speakerphone representation, and during the hearing regarding Juror No. 8, neither Huante nor his attorneys (Deckler or Whisenand) objected that the speakerphone setup was inadequate. By failing to assert in the trial court that the speakerphone setup deprived of him of his right to counsel, Huante has forfeited this contention on appeal. (See *People v. Garceau* (1993) 6 Cal.4th 140, 179 [failure to object in the trial court "waives" claim on appeal; *In re Sheena K.* (2007) 40 Cal.4th 875, 880, fn. 1 [accurate term is forfeiture instead of waiver].)

17

## C

### *The Error Was Not Structural*

To the extent defendant contends no objection was needed and that the error was structural (obviating the need for a harmless error analysis) because this was an "outright denial of counsel at the hearing," we disagree.  The United States Supreme Court has stated, "Our precedents do not clearly hold that counsel's participation by speakerphone should be treated as a 'complete denial of counsel,' on par with total absence. Even if we agree with [the defendant] that a lawyer physically present will tend to perform better than one on the phone, it does not necessarily follow that mere telephone contact amounted to total absence or 'prevented [counsel] from assisting the accused' . . . .  The question is not whether counsel in those circumstances will perform less well than he otherwise would, but whether the circumstances are likely to result in such poor performance that an inquiry into its effects would not be worth the time." (*Wright v. Van Patten* (2008) 552 U.S. 120, 125 [169 L.Ed.2d 583, 588].)

The circumstances here did not approach that level.  The court repeated for trial counsel Deckler anything Deckler could not hear.  The court also described the juror's demeanor for Deckler, and cocounsel Whisenand concurred in the court's description. Deckler was able to privately talk with cocounsel Whisenand during the hearing regarding excusing Juror No. 8 via a telephonic landline and then have the substance of those talks conveyed to Huante through Whisenand.  Finally, cocounsel Whisenand was able to convey trial counsel Deckler's position at sidebar.

Contrary to Huante's argument, the record shows that Deckler was able to participate in the proceedings via speakerphone despite any technical difficulties with that speakerphone, and Huante was not deprived of the total assistance of counsel.

We note one final point.  While the alleged error here was not structural and does not warrant reversal, we caution against the practice of telephonic participation by counsel in a case such as this.  This case involved two defendants, serious charges, highly

18

technical legal issues, and, by the time counsel retired, a client who had been found guilty of murder. Deckler, literally, did not stand by his client during important proceedings, leading to these appellate arguments by his client regarding the alleged deficiencies that befell him as a result. These arguments all could have been avoided had the trial court not permitted the practice here, i.e. allowing one's attorney to retire before the trial and sentencing were complete.

## VII

### *There Were No Multiple Errors To Accumulate*

Huante contends the cumulative effect of the alleged errors here denied him a fair trial. We have found only one error (regarding the court's instructions on conspirator liability for first degree murder under the natural and probable consequences doctrine as it pertained to Huante), so there are no multiple errors to accumulate.

## DISPOSITION

The judgment is affirmed as to Rivera.

Huante's conviction of first degree murder is reversed unless the People accept a reduction of the conviction to second degree murder. If, after the filing of the remittitur in the trial court, the People do not bring Huante to retrial on the premeditation and deliberation element within the time set forth in Penal Code section 1382, subdivision (a)(2) -- 60 days unless waived by the defendant-- the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of second degree murder and shall resentence Huante accordingly.

                                       _____ROBIE_____, Acting P. J.

We concur:


_____DUARTE_____, J.


_____HOCH_____, J.

19