CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANCISCO MUNOZ VIRGEN,<br><br>    Defendant and Appellant. | B333314<br><br>(Los Angeles County<br>Super. Ct. No. TA146714) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kelvin D. Filer, Judge. Reversed and remanded with directions.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Idan Ivri and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Francisco Munoz Virgen and two codefendants were charged with murder and assault with a semiautomatic firearm. At the first trial, the jury hung on the murder and assault charges as to all three defendants. After the court declared a mistrial, Virgen and the first codefendant were retried, while the second codefendant reached a plea agreement with the People.

At the second trial, the second codefendant testified for the prosecution. He presented testimony that is consistent with a theory that he, Virgen, and the first codefendant engaged in an uncharged conspiracy to assault the murder victim and that during the assault, the first codefendant shot and killed the victim.

The court instructed on aiding and abetting principles and an uncharged conspiracy to commit assault. Relevant to this appeal, the court used the final paragraph of CALCRIM No. 400, which told the jury that in some circumstances, a defendant may be convicted of crimes other than the one he intended to commit, so long as the other crimes occurred during the commission of the first crime. The court also used CALCRIM No. 416 to instruct the jury that it could find "[a] member of a conspiracy [is] criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy." Neither the court nor the prosecutor told the jury that it could not rely on the final paragraph of CALCRIM No. 400 or CALCRIM No. 416 to convict Virgen of murder.

The jury at Virgen's second trial found him not guilty of first degree murder but guilty of second degree murder, and it did not reach a verdict on the assault charge or the firearm enhancement allegation attached to the murder charge.

The court declared a mistrial as to the assault charge, and it interpreted the jury's deadlock on the firearm allegation as a not true finding. The court sentenced Virgen to 15 years to life in prison.

On appeal, Virgen raises two claims of instructional error arising out of his second trial. First, he argues the court's use of CALCRIM No. 400's final paragraph and CALCRIM No. 416 permitted the jury to convict him of murder without needing to find that he acted with malice. Second, he contends the court should have instructed on involuntary manslaughter as a lesser included offense of murder. Virgen also contends, and the People agree, that the court miscalculated his presentence custody credits.

We agree with Virgen's first contention and conclude that it is reasonably likely that the jury understood it could use CALCRIM No. 400's final paragraph and CALCRIM No. 416 to convict Virgen of murder without finding that he acted with malice aforethought. Because we cannot conclude beyond a reasonable doubt that the instructional error was harmless, we must reverse Virgen's murder conviction and remand for a retrial on that count.

## FACTUAL BACKGROUND

### 1. Events leading to the murder

Around 2014, Brenda A. was introduced to Alberto Martinez, a death row inmate and a "right-hand man," or influential associate, of the Mexican Mafia. Brenda and Martinez started a romantic relationship soon after they met. Brenda also began working as a "secretary" for Martinez and the Mexican Mafia. Brenda received and transferred money and made phone calls for Martinez.

3

Around June 2016, Brenda met Guillermo Toledo, another gang member. After they started dating, Toledo tried to convince Brenda to end her relationship with Martinez because she could get into trouble working for him. Martinez was unhappy about Brenda's relationship with Toledo, and he often sent men to Brenda's home to check on her and Toledo.

**2.    The murder**

Brenda and Michael Haynie testified to different versions of the events leading to Toledo's murder.

**2.1.    Haynie's account**

On October 23, 2016, Martinez contacted Haynie, a former prisoner who continued to work favors for Martinez. Martinez asked Haynie to confront Toledo with Virgen and Victor Soto. Martinez wanted the three men to beat up Toledo. According to Haynie, Martinez never asked Haynie to kill Toledo.

Later that day, Haynie and Soto met Virgen in Pacoima. The three men drove together to Brenda's home in Compton. While in the car, Virgen showed Haynie the gun that Virgen was carrying.

At Brenda's home, Haynie, Virgen, Soto, Brenda, and Toledo talked outside the front door. One of the men told Toledo that Martinez wanted to speak to him on the phone. Toledo became upset, and Haynie tried to calm him down.

At some point during their conversation, a car parked in front of Brenda's home. Toledo approached the car and interacted with someone inside it before returning to Brenda's home. Toledo went inside the home for a few moments, during which time Haynie heard what he believed was Toledo chambering a round inside a gun. When Toledo went back

4

outside, he kept his hand inside his pocket. Haynie told Soto and Virgen that he believed Toledo had a gun.

Toledo eventually agreed to speak to Martinez over the phone. When their conversation ended, Toledo told Brenda to go inside the home. Once Brenda went inside, Haynie put his hand on Toledo's arm, to prevent Toledo from pulling out his gun. Soto then punched Toledo, and Virgen pulled out a gun.

Brenda returned to the porch and tried to shield Toledo and pull him back inside the home. Virgen then shot Toledo in the leg before trying to take Toledo's gun. When Haynie saw a bystander watching the altercation, he ran to the car. While at the car, Haynie heard a second gunshot. When he looked at Brenda's home, he saw Soto standing over Toledo's body while pointing a gun at Toledo's head. Haynie saw Virgen remove a gun from Toledo's pocket before they fled the scene.

### 2.2. Brenda's account

On the evening of October 23, 2016, Brenda and Toledo were hanging out at her home when Haynie and Virgen arrived unannounced. The group talked in front of Brenda's front door for several minutes before Soto joined.

At some point during the conversation, Toledo told Brenda to go inside the home. Shortly after Brenda went inside, she heard what sounded like a body slamming against the wall. When Brenda went back outside, she saw Haynie, Virgen, and Soto hitting Toledo. As she tried to pull Toledo inside the home, she saw Virgen pointing a gun at him. Brenda tried to grab the gun and asked Virgen not to shoot Toledo before Virgen pointed the gun at her. He threatened to shoot Brenda if she did not move.

5

Virgen then handed the gun to Soto, who pointed it at Toledo's head.  Virgen nodded, and Soto shot Toledo in the head. Toledo later died of his injuries.

**PROCEDURAL BACKGROUND**

The People charged Virgen, Soto, and Haynie with Toledo's murder (Pen. Code,[1] § 187; count 1) and assault with a semiautomatic firearm against Brenda (§ 245, subd. (b); count 2). The People alleged firearm, prior conviction, and gang enhancements.

At the first trial, which concluded in January 2020, the jury deadlocked on all charges as to each defendant, with the jurors split almost equally between votes for guilty and not guilty on each charge.  The court declared a mistrial.  Before Virgen and Soto were retried, Haynie reached a plea agreement with the People on an assault charge with force likely to produce great bodily injury.  In exchange for the plea deal, Haynie agreed to testify at Virgen's and Soto's second trial.

The second trial was held in late 2022.  The jury found Virgen guilty of second degree murder, while finding him not guilty of first degree murder.  The jury deadlocked as to the assault charged against Virgen in count 2, and it did not reach a finding as to the section 12022.5, subdivision (a), firearm enhancement alleged against him in count 1.  As to Soto, the jury found him not guilty of first degree murder, while deadlocking on the remaining charges.  The court deemed the jury's deadlock on the firearm enhancement alleged against Virgen in count 1 as a

---

[1]     All undesignated statutory references are to the Penal Code.

6

"not true" finding, and it declared a mistrial as to all counts on which the jury deadlocked.

At the People's request, the court dismissed the assault charged against Virgen in count 2. The court sentenced Virgen to 15 years to life in prison.

Virgen appeals.

## DISCUSSION

Virgen contends his murder conviction must be reversed because the court's instructions allowed the jury to convict him of murder under an invalid imputed malice theory. We agree.

## 1.    The court's instructions

At Virgen's second trial, the court instructed the jury on aiding and abetting principles using CALCRIM Nos. 400 and 401. As read to the jury, CALCRIM No. 400 provided, "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. [¶] *Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime.*"[2] (Italics added.)

CALCRIM No. 401 informed the jury that to find Virgen guilty of a crime based on a direct aiding and abetting theory, the People needed to prove: "1. The perpetrator committed the crime;

---

[2]     At Virgen's first trial, the trial court did not instruct the jury with the italicized language from CALCRIM No. 400.

7

[¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

Immediately after instructing on direct aiding and abetting principles, the court read CALCRIM No. 416, which addressed the use of evidence of an uncharged conspiracy to commit assault. Relevant here, CALCRIM No. 416 stated: "The People have presented evidence of a conspiracy. *A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy.*" (Italics added.) The instruction stated that to establish Virgen was a member of a conspiracy, "the People must prove that: [¶] 1. The defendant intended to agree and did agree with one or more of the other defendants or the co-conspirators to commit an assault; [¶] 2. At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit an assault; [¶] 3. One of the defendants, or the co-conspirators, or all of them committed the following overt act to accomplish an assault: drive in a single vehicle with firearm; [¶] AND [¶] 4. This overt act was committed in California." CALCRIM No. 416 concluded: "The People contend that the defendant conspired to commit one of the following crimes: an assault. You may not find (the/a) defendant guilty under a conspiracy theory unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes, and you all agree which crime (he/she) conspired to commit."

8

The court also gave the jury CALCRIM No. 418, which instructed the jury on when it could use Martinez's out-of-court statements concerning the uncharged conspiracy. Using CALCRIM No. 419, the court instructed the jury that Virgen was not responsible for any acts that were done before he joined the conspiracy.[3]

Next, the court instructed on the principles of homicide and self-defense. The court used CALCRIM No. 520 to define murder with malice aforethought and CALCRIM No. 521 to define first degree murder with premeditation and deliberation.

The court also instructed the jury with CALCRIM No. 200, which stated in relevant part: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions. Pay careful attention to all of these instructions and consider them together."

## 2.    Standard of review

A trial court must instruct on general legal principles relevant to the issues raised by the evidence. (*People v. Alexander* (2010) 49 Cal.4th 846, 920.) The court also must refrain from instructing on legal principles that either are irrelevant to the issues raised by the evidence or are likely to confuse the jury or relieve the jury from making findings on relevant issues. (*Ibid.*)

A court's failure to instruct on the elements of an offense, or any misinstruction that has the effect of relieving the jury of

---

[3]    At Virgen's first trial, the trial court did not instruct with CALCRIM Nos. 416, 418, or 419, or any other instructions addressing conspiracy principles.

9

its burden to find the defendant guilty of every element beyond a reasonable doubt, violates a defendant's due process rights. (*People v. Hendrix* (2022) 13 Cal.5th 933, 942.)  Specifically, such an error deprives the defendant of his or her constitutional right to have a conviction " 'rest upon a jury determination that the defendant is guilty of every element of the crime with which he [or she] is charged, beyond a reasonable doubt.' "  (*Ibid*.)

We review claims of instructional error de novo.  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)  We independently review the instruction's language and evaluate whether it accurately states the law.  (*Ibid*.)  Considering the entire record and the instructions as a whole, we must determine whether there is a "reasonable likelihood" that the trial court's instructions caused the jury to misapply the law.  (*Ibid*.)

### 3. The law of murder

Murder is defined as "the unlawful killing of a human being . . . with malice aforethought."  (§ 187, subd. (a).)  For decades, malice could be imputed to a defendant based only on his or her participation in a crime in which a killing occurred. (*People v. Gentile* (2020) 10 Cal.5th 830, 844–845 (*Gentile*), superseded by statute on other grounds as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.)  That is, a defendant could be convicted of murder under a natural and probable consequences or felony murder theory without any finding that he or she acted with malice aforethought.  (*Gentile*, at p. 845 [natural and probable consequences doctrine]; *People v. Chun* (2009) 45 Cal.4th 1172, 1182 (*Chun*) [felony murder rule].)

In 2014, the California Supreme Court eliminated the natural and probable consequences doctrine as a basis for convicting a defendant of first degree murder.  (*People v. Chiu*

10

(2014) 59 Cal.4th 155, 167 (*Chiu*).) Four years later, the Legislature enacted Senate Bill No. 1437, which eliminated the natural and probable consequences doctrine as a basis for convicting a defendant of murder regardless of degree. (*Gentile*, *supra*, 10 Cal.5th at pp. 846–848.) It accomplished this by amending section 188, which provides in relevant part: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Section 189, subdivision (e) defines first degree felony murder, a theory not at issue in this case. (*Chun*, *supra*, 45 Cal.4th at p. 1182.) Now, to convict a defendant of murder under a theory other than felony murder, the People must prove that the defendant acted with malice aforethought. (*People v. Curiel* (2023) 15 Cal.5th 433, 449.)

4.  **The court's instructions permitted the jury to convict Virgen of second degree murder under an imputed malice theory**

Virgen contends the court's instructions addressing the roles of perpetrators and aiders and abettors (CALCRIM No. 400) and the use of evidence of an uncharged conspiracy to commit assault (CALCRIM No. 416) allowed the jury to convict him of second degree murder without finding that he acted with malice aforethought. According to Virgen, the jury could have applied those instructions to find him guilty of murder simply because he conspired to assault Toledo, and Toledo's murder occurred during the assault. In other words, Virgen argues that the jury could have imputed malice to him based solely on his participation in the uncharged conspiracy to assault Toledo. We agree.

11

Evidence of an uncharged conspiracy may be used "to prove criminal liability for acts of a coconspirator." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1200, abrogated on another ground by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; see also *People v. Prettyman* (1996) 14 Cal.4th 248, 261 [noting that the natural and probable consequences doctrine has been applied to conspirators].) Under an uncharged conspiracy theory, " ' "[e]ach member of the conspiracy is liable for the acts of any of the others in carrying out the *common* purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design." ' " (*In re Hardy* (2007) 41 Cal.4th 977, 1025–1026.) "[E]ach member of a conspiracy is criminally responsible for the acts of fellow conspirators committed in furtherance of, and which follow as a natural and probable consequence of, the conspiracy, even though such acts were not intended by the conspirators as a part of their common unlawful design." (*People v. Zielesch* (2009) 179 Cal.App.4th 731, 739 (*Zielesch*).)

Murder liability based on an uncharged conspiracy to commit murder remains a valid legal theory because it requires proof that the defendant acted with express malice regardless of whether he was the actual killer. (See *People v. Medrano* (2021) 68 Cal.App.5th 177, 185 [conspiracy to commit murder requires proof that the defendant had the intent to kill].) But after Senate Bill No. 1437 went into effect, a defendant may no longer be convicted of murder based on a theory that he or she conspired to commit a non-murder offense because such a theory imputes malice to the defendant based on his or her participation in the nonmurder offense, without any need to find the defendant acted with actual malice. (*People v. Offley* (2020) 48 Cal.App.5th 588, 599 (*Offley*).) That is, murder based on a conspiracy to commit a

12

crime other than murder operates in the same manner as the natural and probable consequences doctrine.  (See *People v. Rivera* (2015) 234 Cal.App.4th 1350, 1356 (*Rivera*) [explaining that a natural and probable consequences theory of murder and murder based on an uncharged conspiracy to commit a crime other than murder are "analogous"].)

In *Rivera*, a case that predates Senate Bill No. 1437 but was decided after the Supreme Court in *Chiu* invalidated the natural and probable consequences doctrine for first degree murder, the appellate court addressed a set of instructions like the ones at issue in this case.  There, the defendant was charged with, and convicted of, first degree murder.  (*Rivera*, *supra*, 234 Cal.App.4th at p. 1354.)  The trial court instructed the jury that it could find the defendant guilty of murder under a direct aiding and abetting theory or an uncharged conspiracy theory, where one of the enumerated target offenses was discharging a firearm at an occupied vehicle.  (*Id*. at pp. 1354–1355.)

The appellate court reversed the defendant's conviction, concluding that "[u]nder these instructions, it was possible for the jury to have found [the defendant] guilty of first degree murder if it found the target crime of the uncharged conspiracy was discharging a firearm at an occupied vehicle and that first degree murder was a natural and probable consequence of that target crime." (*Rivera*, *supra*, 234 Cal.App.4th at p. 1355.)  Citing the Supreme Court's decision in *Chiu*, *supra*, 59 Cal.4th 155, the *Rivera* court explained that the prosecution's uncharged conspiracy theory was analogous to a natural and probable consequences theory and, as a result, could no longer support a conviction for first degree murder because it did not require the

13

jury to find the defendant acted with the requisite mental state. (*Rivera*, at pp. 1356–1357.)

Here, the court used two instructions—CALCRIM Nos. 400 and 416—that, when read together, could have allowed the jury to find Virgen guilty of murder under an uncharged conspiracy theory, without finding that he acted with malice aforethought. The final paragraph of CALCRIM No. 400 informed the jury that "[u]nder some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime." CALCRIM No. 400's bench notes explain that the instruction's final paragraph should only be given if the People are relying on a natural and probable consequences theory. (Judicial Council of Cal., Crim. Jury Instns. (2022) Bench Notes to CALCRIM No. 400.) The court never instructed the jury that the final paragraph of CALCRIM No. 400 did not apply to Virgen's murder charge. (See *Gentile*, *supra*, 10 Cal.5th at pp. 847–848 [the natural and probable consequences doctrine is no longer a valid theory of murder].)

Although the court did not instruct on the natural and probable consequences doctrine, it used CALCRIM No. 416 to instruct on an uncharged conspiracy to commit assault. CALCRIM No. 416's first paragraph told the jury that Virgen could be convicted of another crime that occurred during the commission of the conspiracy's target offense if it found Virgen conspired to commit the target offense and the other crime was "done to help accomplish the goal of the conspiracy." In addition, the instruction's final paragraph told the jury that it could convict Virgen "under a conspiracy theory" if each member of the jury agreed Virgen conspired to commit assault. The court never

14

instructed the jury that it could not rely on CALCRIM No. 416 to convict Virgen of murder.

Thus, when read together, CALCRIM Nos. 400 and 416 told the jury that a "specific circumstance[]" where Virgen could be convicted of a crime other than the crime he intended to aid and abet was if he conspired to commit an uncharged assault, and one of his coconspirators committed another crime, such as murder, during the assault. As we just explained, such a theory is analogous to the natural and probable consequences doctrine, as it allows the jury to impute malice to a defendant based only on his participation in the uncharged conspiracy's target offense. (*Rivera*, *supra*, 234 Cal.App.4th at pp. 1355–1356.)

Based on the evidence presented at Virgen's second trial, the only crime that could serve as the target offense for the uncharged conspiracy was Toledo's assault. CALCRIM No. 416 told the jury that assault was the target offense of the conspiracy, and that it needed to find that at least one of the coconspirators engaged in the overt act of driving in a single vehicle with a gun. Haynie testified that Martinez instructed him (Haynie), Virgen, and Soto to go to Brenda's home to "beat up" Toledo because Martinez was unhappy about Brenda and Toledo's relationship. Haynie also testified that the three men agreed to confront Toledo together, and that they all drove in a single car to Brenda's home while Virgen was carrying a gun. Although Virgen was charged with assaulting Brenda in count 2, there was no evidence that Virgen and any of his cohorts conspired to assault Brenda.

In addition, the evidence from Virgen's second trial supports a finding that Toledo was killed in furtherance of the conspiracy to assault him. Haynie testified that Soto shot and

15

killed Toledo while Virgen and Soto were still fighting with Toledo outside Brenda's home. Thus, if the jury applied CALCRIM No. 416 to Virgen's murder charge, it could have found him guilty of murder based on his participation in the conspiracy to assault Toledo, without needing to find that he acted with malice aforethought. (See *Offley*, *supra*, 48 Cal.App.5th at p. 599.)

In arguing the court's instructions did not permit the jury to convict Virgen of murder under an imputed malice theory, the People focus on the court's use of CALCRIM No. 400's final paragraph. They acknowledge that it was technically error for the court to use that portion of the instruction, but they argue the jury was not likely to construe that language in a manner that would allow it to convict Virgen of murder without finding he acted with malice aforethought. That is because, the People argue, the court never instructed the jury with CALCRIM Nos. 402 and 403, which address in detail the natural and probable consequences doctrine. This argument lacks merit.

A court's use of CALCRIM No. 400's last paragraph, *by itself*, usually is not sufficient to allow the jury to impute malice to the defendant based only on his or her participation in a crime other than the charged murder, so long as the court properly instructs on direct aiding and abetting principles, and its other instructions require the jury to find the defendant acted with malice aforethought before convicting him or her of murder. (See *People v. Estrada* (2022) 77 Cal.App.5th 941, 946–949.) But, as we just explained, the court used CALCRIM No. 416 to instruct the jury that Virgen was criminally responsible for other crimes committed by his coconspirators in furtherance of the conspiracy to assault Toledo, and nothing in that instruction told the jury

16

that it needed to find Virgen acted with malice aforethought before convicting him of murder under an uncharged conspiracy theory. (See *Offley*, *supra*, 48 Cal.App.5th at p. 599 [reversing denial of section 1172.6 petition at prima facie stage because court's instructions on uncharged conspiracy to commit assault with a firearm made it possible for the jury to convict the defendant of murder without finding he acted with malice aforethought].)

The People next argue it is not reasonably likely that the jury understood it could use CALCRIM No. 416 to convict Virgen of murder under an uncharged conspiracy theory because that instruction "only applied as a way to prove [Virgen] was guilty of 'the goal of the conspiracy,' which was 'an assault,' not the murder." The People misconstrue the instruction's language.

CALCRIM No. 416 told the jury that it could find Virgen guilty of any acts or statements done by his coconspirators "*to help accomplish the goal of the conspiracy*." (Italics added.) That language encompasses more than just the target assault, as it also includes any other crimes committed by Virgen's coconspirators in furtherance of the assault. (See *Zielesch*, *supra*, 179 Cal.App.4th at p. 739 [a member of a conspiracy is criminally responsible for acts of coconspirators committed in furtherance of the conspiracy, even if such acts were not intended to be part of the conspiracy].) In any event, as we just explained, the only target offense of the uncharged conspiracy that is supported by the evidence is Toledo's assault, but Virgen was never charged with assaulting Toledo. Thus, there was no reason for the court to instruct the jury that it could convict Virgen of *assaulting* Toledo if Virgen was never charged with that crime.

17

The People also argue it is not reasonably likely that the jury relied on CALCRIM Nos. 400 and 416 to convict Virgen of murder under an imputed malice theory because the prosecutor did not rely on such a theory during his opening statement and closing arguments. Instead, the People point out, the prosecutor relied only on a theory that Virgen directly aided and abetted Soto in killing Toledo, and the prosecutor informed the jury that it needed to find Virgen acted with malice aforethought before convicting him of murder. We disagree.

As our Supreme Court has explained, a jury is not limited in its deliberations to theories that the prosecutor relied on during opening statements or closing arguments. (*People v. Clark* (2011) 52 Cal.4th 856, 947.) "It is elementary . . . that the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.) Indeed, juries " 'are warned in advance that counsel's remarks are mere argument.' " (*People v. Cortez* (2016) 63 Cal.4th 101, 131.) Thus, a prosecutor's argument should not be given " 'undue weight' " when " 'analyzing how a reasonable jury understood . . . instructions.' " (*Ibid*.) In other words, " 'argument should "not be judged as having the same force as an instruction from the court." ' " (*Id*. at pp. 131–132.)

Here, the court instructed the jury that it was required to follow the law as explained by the court, and to the extent the attorneys' explanation of the law differed from the court's instructions, the jury was required to disregard the attorneys' explanations. Thus, the prosecutor's argument, by itself, could not have cured the defects in the court's instructions. In any event, the prosecutor's argument in this case cuts both ways.

Although the prosecutor did not suggest to the jury that it could rely on an uncharged conspiracy theory to convict Virgen of murder, the prosecutor never told the jury that it could not do so. The prosecutor's argument, therefore, did not preclude the jury from relying on CALCRIM No. 416 to convict Virgen of murder under an invalid imputed malice theory.

5.     **The error was prejudicial**

When the trial court instructs the jury on valid and invalid theories of guilt, we must reverse the conviction "unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt." (*In re Lopez* (2023) 14 Cal.5th 562, 592.)  Generally, "the presumption is that the error affected the judgment:  ' "Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action . . . fails to come within the statutory definition of the crime.  When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error." ' " (*People v. Fleming* (2018) 27 Cal.App.5th 754, 769, quoting *In re Martinez* (2017) 3 Cal.5th 1216, 1224.)

Here, we cannot conclude beyond a reasonable doubt that the jury did not rely on CALCRIM No. 416 when it convicted Virgen of murder.  As we already discussed, no one told the jury at Virgen's second trial that it could not rely on that instruction or an uncharged conspiracy theory when evaluating Virgen's guilt for murder.  Further, nothing in the jury's verdict shows the jury did not rely on an uncharged conspiracy theory to convict Virgen of murder.  Although the jury found Virgen guilty of

19

second degree murder, it found him not guilty of first degree murder, and it could not make a finding as to whether Virgen used a gun during the offense. Indeed, nothing on the second degree murder verdict form asked the jury whether it found that Virgen acted with malice aforethought.

Notably, the jury at Virgen's first trial hung on the murder charge, with the jurors' votes split almost equally between guilty and not guilty. The court did not use CALCRIM No. 416, or otherwise instruct on an uncharged conspiracy theory, at that trial. Nor did Haynie testify at the first trial. As we explained above, his testimony at the second trial supplied much of the foundation for an uncharged conspiracy theory. It was not until Haynie testified at Virgen's second trial and the court used CALCRIM No. 416 that the jury reached a guilty verdict on Virgen's murder charge. (See *People v. Ross* (2007) 155 Cal.App.4th 1033, 1055 [prejudice from instructional error at second trial may be inferred from fact that error did not occur at first trial where jury was unable to reach a verdict].)

In sum, the court erred when it instructed the jury with CALCRIM No. 400's final paragraph and CALCRIM No. 416 because it is reasonably likely that the jury understood it could use those instructions to convict Virgen of murder without finding that he acted with malice aforethought. Since we cannot conclude beyond a reasonable doubt that the instructional error was harmless, we must reverse Virgen's murder conviction and remand the matter for a retrial on second degree murder as to count 1. Considering this disposition, we need not reach the other arguments that Virgen raises on appeal.

## DISPOSITION

The judgment is reversed.  The matter is remanded for a retrial on count 1.


VIRAMONTES, J.

WE CONCUR:


STRATTON, P. J.


GRIMES, J.