Filed 3/19/24  In re Demirdjian on Habeas Corpus CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re<br><br>MICHAEL HRAYR DEMIRDJIAN<br><br>On Habeas Corpus. | B331468<br><br>(Los Angeles County<br> Super. Ct. No. GA043471) |

ORIGINAL PROCEEDINGS in Habeas Corpus.  Hayden A. Zacky, Judge.  Petition granted.

Bess Stiffelman for Petitioner.

No appearance for Respondent.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Taylor Nguyen and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

In 2001, a jury found Michael Hrayr Demirdjian guilty of two counts of first degree murder. The jury found true the multiple murder and torture-murder special circumstance allegations. The jury also found the allegation that Demirdjian was 14 years of age or older when he personally killed the victims and that a special circumstance was found to be true.

In 2014, our Supreme Court held in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*) that a natural and probable consequences theory of liability cannot serve as a basis for a first degree murder conviction. In 2023, Demirdjian filed a habeas corpus petition seeking relief under *Chiu*, contending the jury was improperly instructed that he could be convicted of first degree murder under the natural and probable consequences doctrine. In response, the Attorney General argues the petition is procedurally barred as untimely and further disputes *Chiu* error. In any event, he asserts any error is harmless because the jury convicted Demirdjian as the actual killer based on its finding that he personally killed the victims as well as the overwhelming evidence of premeditated murder.

As a preliminary matter, we reject the Attorney General's assertion that the habeas petition was untimely. We conclude the trial court committed *Chiu* error and that the error was prejudicial. Accordingly, we grant the petition.

## FACTUAL AND PROCEDURAL HISTORY

I.    *Trial Evidence*

We take the factual background from our first unpublished opinion in this case, *People v. Demirdjian* (Apr. 29, 2003, B157230 [non. pub.]), a Ninth Circuit opinion in a prior, unrelated habeas petition (*Demirdjian v. Gipson*

(9th Cir. 2016) 832 F.3d 1060), and Demirdjian's trial transcripts provided in this writ proceeding.

At approximately 8:00 p.m. on Sunday, July 23, 2000, the bodies of 14-year-old Blaine Talmo, Jr. (Blaine) and 13-year-old Chris McCulloch (Chris) were found at an elementary school playground in La Crescenta. Police arrived shortly thereafter and determined the boys were dead. There was a 16-pound rock next to Blaine's head and a 3-pound rock a few yards away. Both boys had head injuries and there was blood all over the school yard—on fences, rails, playground equipment and in two outdoor sinks. There was also a broken bottle with a red stain on it. A 60-pound, 12-foot long bench was lying across Chris' chest and neck. A trail of bloody footprints led from the bodies to the sinks. The right front pocket of Blaine's pants was pulled out, as if emptied.

On July 24, 2000, pursuant to a search warrant, the police searched Demirdjian's house. They found Blaine's clock and wallet in a trash can, along with a pair of Demirdjian's Reebok tennis shoes. The shoes were wet and smelled like detergent, but blood was still on them. There was blood on the front door, bathroom wall, and on Demirdjian's bedsheets. Demirdjian had fresh cuts on his hands and knuckles.

Autopsies showed the boys died of multiple blunt force trauma to their heads and bodies. The rocks were identified as potential weapons. Chris' neck and chest were compressed, and his liver was torn apart. DNA testing revealed Demirdjian's blood next to the bloody shoe prints. Bloodstains at Demirdjian's house were analyzed and found to contain Demirdjian's and Chris' DNA. A criminalist with expertise in shoe print identification analyzed photographs of the bloody shoeprints and determined that the wear

3

patterns matched those of Demirdjian's Reeboks, not of any of the shoes belonging to other suspects.

On July 28, 2000, police seized Demirdjian's computer. The computer contained a poem, which had been downloaded from the Internet, containing the phrases, "And then I'll get a big-ass rock/And I'll drop it on your head/And you'll be shaking with dread/Thinking that you should never have fucked with me." Police also found photographs of a man choking a boy, which also had been downloaded from the Internet. The file containing the photographs was accessed on March 11, 2000, and May 4, 2000, then the file was downloaded again the day after the killing, on July 23, 2000. The records of Demirdjian's Internet provider indicated he signed on at 11:27 p.m. on the night of July 22, 2000, signed off at 11:40 p.m., signed on again at 11:42 p.m. and off at 12:04 a.m.

The following testimony was provided about the victim's activities prior to their murders. Blaine had a fight with his father on Friday, July 21, 2000, and Blaine left the house. Blaine went to New York Park in La Crescenta, a few minutes away from his home, with Chris and two other friends, Vartan K. and Nicholas T. Blaine returned to his house briefly to pick up an alarm clock and blankets and returned to the park. Blaine's mother visited him at the park at approximately 7:00 p.m. Blaine said he was not ready to go home. He then spent the night with Chris and Vartan at Nicholas's house. At 8:00 a.m. on Saturday, July 22, 2000, they left Nicholas's house and Chris and Blaine went off by themselves. At 5:11 p.m. someone at Blaine's house called Demirdjian's cell phone. At 7:14 p.m. Blaine used Demirdjian's cell phone, first to call Nicholas, then to call his mother. At 7:45 p.m., Demirdjian, Chris, and Blaine played basketball at New York Park. At 8:31 p.m. Blaine used Demirdjian's cell phone to call his mother. At 9:49 p.m.

4

Chris used Demirdjian's cell phone to call a friend and said they were scared because people were following them and "scaring them and jumping out of [the] bushes." At 10:31 p.m., Blaine used Demirdjian's cell phone to call his mother, saying he was having fun and was not ready to come home yet. On Sunday, July 23, 2000, after the victim's bodies were discovered, Blaine's mother drove to Demirdjian's house. She asked if he had seen Blaine, and Demirdjian said he had been with Blaine on Saturday but had not seen him on Sunday. Demirdjian told her that he thought Blaine said he was spending the night at New York Park.

A witness who lived near the school where the bodies were found testified that at around 10:35 p.m. on Saturday night, he saw a group of five teenagers sitting on the curb near a dark blue car. He identified Damian K. from a photographic lineup as one of the teenagers.

Greg Furnish, Keith Shill and Grant Meyer, all friends of Demirdjian, testified under a grant of use immunity. Furnish testified that he and Adam Walker were partners selling drugs in the La Crescenta-La Canada area. He specifically recalled selling marijuana to Blaine. On July 17, 2000, he received a call from a person identifying himself as "Mike." Demirdjian's first name is Michael. Mike said Blaine had given him Furnish's name and he wanted to purchase two ounces of chronic, a high potency form of marijuana. After the call ended, Furnish and Walker discussed a plan to steal Mike's money. That day, Shill and Walker met someone they thought was Demirdjian. Shill and Walker took $660 from Demirdjian without giving him any drugs and sped off in a vehicle driven by Meyer. When they returned to the Furnish residence, a series of pages with the number "187", apparently signifying the Penal Code section for murder, appeared on Walker's pager.

5

Furnish claimed he was with Walker, Shill, and Meyer on the night of the murders.

On July 19, 2000, Demirdjian, Damian, and three others visited Michael-Shawn Boultinghouse. Damian told Boultinghouse that Walker had stolen money from him and Demirdjian. Damian said he wanted to get even with Walker, and Demirdjian agreed. They asked Boultinghouse to set up a false purchase of marijuana from Walker. Boultinghouse paged Walker and asked Walker to sell him marijuana. Boultinghouse left before the false sale was completed. Damian then made another false purchase with his girlfriend, two other friends and Demirdjian. Damian's girlfriend waited for Walker outside the La Crescenta Library. When Walker arrived in a truck, Damian, Demirdjian, and another male burst out of hiding. Damian and Demirdjian brandished fake guns. Walker quickly drove away. Phone records indicated 47 calls from Demirdjian's cell phone to Damian between July 17 and July 22, 2000.

Demirdjian was tried twice. At the first trial, he testified he had witnessed Walker murder the victims but had not himself participated in the murders. The trial resulted in a hung jury, deadlocked at 8-4 in favor of conviction after a week of deliberations. At the second trial, Demirdjian did not testify.

At trial, the prosecution theorized that Demirdjian had committed the murders out of revenge because one victim had introduced him to Walker, who was their 19-year-old drug dealer. Walker subsequently stole money from Demirdjian in a drug transaction and Demirdjian spent a week unsuccessfully seeking revenge on Walker. The prosecution stated his weapons of choice were "beebee guns and knife, simulated weapons." But then, according to the prosecution, Demirdjian decided to rob and beat to

6

death his two friends (Blaine and Chris) because they were young and "vulnerable." He allegedly used his fists, a rock, and a park bench.

The defense acknowledged that Demirdjian was at the crime scene and witnessed the murders. However, the defense theory was that Walker killed the boys in a drug-induced fit of rage and had his friends help clean up. The defense emphasized that Walker had scrapes and bruises on his body. At the time of the murders, Walker was living with Furnish. The police searched his apartment and found a washed rug, a blood stain initially matching the stain on Demirdjian's door (but later found not to be a match), and, in the trash, damp clothes, gloves, and a newspaper article about the crimes.

## II.    *Closing Argument*

In closing argument, the prosecutor contended Demirdjian was guilty of first degree murder under four theories of liability: (1) as the actual perpetrator of the murder; (2) as a direct aider and abettor of the murder; (3) as an aider and abettor in a felony murder robbery; or (4) as a coconspirator who conspired to commit robbery and murder was the natural and probable consequence of the robbery conspiracy. The prosecutor repeatedly told the jury it did not need to agree on any particular theory. As to the conspiracy theory, the prosecutor argued that any coconspirator that killed in furtherance of the robbery, or the killing was the natural and probable consequence of the conspiracy to commit robbery, was guilty of first degree murder. The prosecutor also stated the killing could be "intentional[,] unintentional or accidental, no matter who is actually killed."

Despite offering these four theories, the prosecutor focused on Demirdjian's general involvement in the murders rather than his role as a direct perpetrator. The prosecutor also stated the jury did not "have to prove

why the defendant participated" or "what's going on in his head" as "it is not an element of the crime charged and need not be shown." In describing the murders, the prosecutor argued, "[t]his is clearly what starts out as a robbery and ends up a rage killing."

III.  *Jury Instructions*

The jury was instructed on direct perpetrator and aider and abettor theories of liability. As relevant here, the jury was instructed on first degree premeditated murder (CALJIC No. 8.20), which provided, in part: "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree," and "[t]o constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, [he] decides to and does kill."

The jury was instructed on the uncharged conspiracy to commit robbery (CALJIC No. 6.10.5). The jury was further instructed: "Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if that act or declaration is in furtherance of the object of the conspiracy. [¶] A member of a conspiracy is not only guilty of the particular crime that to his knowledge his confederates agreed to and did commit, but is also liable for the natural and probable consequences of any crime of a coconspirator to further the object of the conspiracy, even though that crime was not intended as a part of the agreed upon objective and even though he was not present at the time of the commission of that crime. [¶] You must determine whether the defendant is guilty as a member of a conspiracy to commit the originally agreed upon

8

crime or crimes, and, if so, whether the [murders were] perpetrated by a coconspirator in furtherance of that conspiracy and was a natural and probable consequence of the agreed upon criminal objective of that conspiracy." (CALJIC No. 6.11.)

The jury was then instructed that "[i]f a number of persons conspire together to commit robbery, and if the life of another person is taken by one or more of them in the perpetration of, or an attempt to commit that crime, and if the killing is done in furtherance of the common design and to further that common purpose, or is an ordinary and probable result of the pursuit of that purpose, all of the coconspirators are equally guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental." (CALJIC No. 8.26.)[1]

The jury was also given a special instruction modeled after the (now) former Welfare and Institutions Code section 602, subdivision (b).[2] (CALJIC No. 17.24.1.) It was alleged that "at the time of the commission of the [murders] that the defendant was 14 years of age or older, that the defendant personally killed [the victims], and that a special circumstance, as charged, is true." If the jury found the defendant guilty of murder, it was required to

---

[1] In 2019, CALJIC No. 8.26 was withdrawn in light of the legislative changes enacted by Senate Bill No. 1437 as it no longer states the law. (Stats. 2018, ch. 1015, § 2; Pen. Code, § 188, subd. (a)(3).)

[2] Former Welfare and Institutions Code section 602, subdivision (b) required a juvenile to be prosecuted in adult criminal court if the People alleged that the juvenile, who was 14 years or older at the time, personally killed the victim, and if one of a special circumstances enumerated in Penal Code section 190.2, subdivision (a) was alleged by the People. (Prop. 21, § 18, approved Mar. 7, 2000.)

All further statutory references are to the Penal Code unless otherwise stated.

make a special finding whether or not this allegation had been proven by the People to be true.

IV. *Juror Questions*

During deliberations, the jury asked whether the murder involving torture instruction and the word "defendant" in the murder portion of the verdict forms included an "aider and abettor," not just the actual perpetrator. The court instructed that both instances allowed for aider and abettor liability.

V. *Verdict*

On November 1, 2001, after deliberating for five days, the jury found Demirdjian guilty of two counts of first degree murder (§ 187, subd. (a)). The jury found true the multiple murder and torture-murder special circumstance allegations. (§ 190.2, subds. (a)(3), (a)(18).) The jury also found the allegation that Demirdjian was 14 years of age or older when he personally killed the victims and that a special circumstance was found to be true (former Welf. & Inst. Code, § 602, subd. (b); § 190.2). However, the jury found Demirdjian not guilty of two counts of robbery (§ 211) and found not true the robbery felony murder special circumstance allegations (§ 190.2, subd. (a)(17)). The trial court sentenced Demirdjian to two terms of life in prison without the possibility of parole. On April 29, 2003, petitioner's convictions were affirmed on appeal. (*People v. Demirdjian* (Apr. 29, 2003, B157230) [nonpub. opn.].)

Thereafter, the trial court found Demirdjian's sentence was unauthorized (§ 190.5, subd. (b)) and resentenced him to two terms of 25

10

years to life. On October 24, 2006, Demirdjian's convictions were again affirmed on appeal. (*People v. Demirdjian* (2006) 144 Cal.App.4th 10.)

VI. *Writ Proceedings*

In 2014, our Supreme Court issued its decision in *Chiu,* holding that "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine." (59 Cal.4th at pp. 158–159.)

Almost ten years later, on July 17, 2023, Demirdjian filed a habeas corpus petition in the trial court seeking a reduction in his first degree murder convictions to second degree pursuant to *Chiu*. On August 18, 2023, the court denied the petition.

On September 5, 2023, Demirdjian filed the instant habeas petition in this court, seeking the same relief. On October 4, 2023, the Attorney General filed an informal response and on October 11, 2023, Demirdjian filed a reply. Both parties filed supplemental briefing on the application of *In re Lopez* (2023) 14 Cal.5th 562 (*Lopez*) on the issue of harmless error. On January 3, 2024, we issued an order to show cause why Demirdjian is not entitled to relief. On January 23, 2024, the Attorney General filed a return to the habeas petition, and on February 21, 2024, Demirdjian filed a traverse.

## DISCUSSION

I. *Timeliness*

As a preliminary matter, the Attorney General contends the habeas corpus petition is untimely. We disagree.

There is no "express time limit within which a petitioner must seek habeas corpus relief," and timeliness is measured in terms of when a

11

petitioner knew or should have reasonably known that he had a legal claim for relief. (*In re Nuñez* (2009) 173 Cal.App.4th 709, 723; *In re Robbins* (1998) 18 Cal.4th 770, 780.) Demirdjian readily admits he filed a series of petitions, in pro. per., to recall his sentence. The fact that Demirdjian was able to identify certain changes in the law that led to him filing petitions to recall his sentence, albeit all unmeritorious, does not foreclose the possibility he had no knowledge of *Chiu* and the potential effect on his case.

As Demirdjian correctly points out, it was not until 2017 that the Supreme Court, in *In re Martinez* (2017) 3 Cal.5th 1216, held that *Chiu* constituted a substantive change in criminal law that applied retroactively. After the 2017 decision, Demirdjian had counsel appointed to him but for the sole purpose of preparing a mitigation packet for a future parole hearing. Appointed counsel had no authority to explore the substance of the underlying crimes and would not have reviewed the appellate records. Thus, counsel would not have been able to discern the issue raised in the current habeas petition. It was not until current appointed counsel was asked to review Demirdjian's case in June 2023 on a separate and distinct legal issue that she identified a potential *Chiu* error.

Under these circumstances, we conclude there was no unreasonable delay that prevents Demirdjian from seeking relief.


II.    *Chiu Error*

In *Chiu*, our Supreme Court held "that an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine." (59 Cal.4th at pp. 158–159, italics omitted.) The court reasoned "that due to the vicarious nature of liability under the natural and probable consequences theory (*id*. at p. 164), 'the connection

12

between the [aider and abettor's] culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved . . .' (*id.* at p. 166)." (*People v. Rivera* (2015) 234 Cal.App.4th 1350, 1356 (*Rivera*).) Instead, an aider and abettor's liability for premeditated murder must be based on his or her own culpable mental state. (*Chiu, supra,* 59 Cal.4th at p. 159.)

*Chiu*'s proscription extends to convictions for first degree murder based on a conspiracy that includes murder as a natural and probable consequence of the target crime the conspirators agreed to commit. (*In re Lopez* (2023) 246 Cal.App.4th 350, 357; *Rivera, supra,* 234 Cal.App.4th at p. 1356.) *Chiu* is retroactive and may be raised, as here, in a habeas corpus petition. (*In re Martinez, supra,* 3 Cal.5th at p. 1222.)

Here, the trial court instructed the jury that Demirdjian could be convicted of first degree murder under the natural and probable consequences doctrine. CALJIC No. 8.26 expressly permitted the jury to convict Demirdjian of first degree murder based solely on a finding that he conspired to commit robbery and that murder was the natural and probable consequence of the robbery conspiracy. (See *Rivera, supra,* 234 Cal.App.4th at p. 1357 [trial court "erred in instructing the jury it could reach a verdict of first degree murder . . . if it found that the target crime of the uncharged conspiracy was discharging a firearm at an occupied vehicle and that first degree murder was a natural and probable consequence of that target crime"].) The Attorney General does not address this dispositive instruction in any of its briefing and simply maintains the jury was not instructed "it could find [Demirdjian] guilty of first degree premeditated murder under the natural and probable consequences doctrine."

The Attorney General also contends the instruction on premeditation forecloses any error because it "required the jury to find that *the defendant* premeditated and deliberated." According to the instructions, only the perpetrator, the "slayer" in the words of the premeditation instruction, needed to have deliberated and premeditated. (CALJIC No. 8.20.) Thus, the jury was not required to find Demirdjian acted with premeditation and deliberation to convict him of first degree murder. Therefore, we agree with Demirdjian that this was error under *Chiu*.

III. *Harmless Error*

Our Supreme Court has recently clarified the applicable standard of review for harmless error. The reviewing court must examine all the evidence and consider all relevant circumstances. (*Lopez, supra,* 14 Cal.5th at p. 592.) The error may be deemed harmless if no reasonable jury could have failed to find the facts necessary to support a valid theory. (*Ibid.*) "Indications that the jury considered an invalid theory, without more, do not undermine that conclusion." (*Ibid.*) The issue is whether a rational jury would have found the defendant guilty based on a valid theory if the jury had been properly instructed. (*Id.* at p. 584.) If the reviewing court determines beyond a reasonable doubt that a rational jury would have made the additional findings, based on the jury's actual verdict and the evidence at trial, the error is harmless because the presentation of the invalid theory to the jury made no difference. (*Id.* at p. 589.)

"The Attorney General bears the burden of showing that the error was harmless beyond a reasonable doubt. [Citations.]" (*Lopez, supra,* 14 Cal.5th at p. 585.) The Attorney General argues the jury's finding that Demirdjian "personally killed" the victims, combined with the overwhelming evidence at

14

trial, demonstrates he was not convicted under the natural and probable consequences theory, rather he was the actual killer.

"It has long been established that an . . . error is harmless beyond a reasonable doubt where "'it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory.'" [Citation.]" (*Lopez, supra*, 14 Cal.5th at pp. 585–586.) The jury finding that Demirdjian "personally killed" the victims is insufficient to render the error harmless beyond a reasonable doubt. CALJIC No. 8.26 allowed the jury to find Demirdjian guilty of first degree murder as the natural and probable consequence of robbery conspiracy even if he had not personally killed the victims. It stated, in part, that "*if the life of another person is taken by one or more of [the coconspirators]* in the perpetration of, or an attempt to commit [the robbery conspiracy], . . . all of the coconspirators are equally guilty of murder of the first degree, *whether the killing is intentional, unintentional, or accidental.*" (Italics added.) Thus, the jury was permitted to find Demirdjian did not personally kill the victims as one of the coconspirators.

Moreover, this jury finding that Demirdjian personally killed the victims does not foreclose the possibility that the killing was unintentional or accidental. Such a killing would not come within the purview of first degree premeditated murder, but rather second degree murder. In addition, to support a finding of first degree premeditated murder, the jury needed to also make a finding as to Demirdjian's subjective mens rea (i.e., that he premeditated the murder). (See *Lopez, supra,* 14 Cal.5th at p. 588 [a jury finding of intent to kill is only one element of premeditated murder and therefore does not by itself establish a valid theory of liability].) Therefore, the jury finding that Demirdjian personally killed the victims does not itself

15

establish all the necessary elements of premeditated murder under a direct perpetrator theory.

We reject the Attorney General's contention that this record overwhelmingly demonstrates Demirdjian premeditated the murders. "[W]hile 'overwhelming' evidence may demonstrate harmlessness, a court's analysis of whether the evidence is 'overwhelming' in this context is not as subjective or free-ranging as that term might imply.  Instead, the analysis requires a court to rigorously review the evidence to determine whether any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury verdict, would necessarily have found the defendant guilty based on a valid theory as well." (*Lopez, supra,* 14 Cal.5th at p. 568.)

The People presented evidence that Walker, a drug dealer, stole money from Demirdjian.  In turn, Demirdjian made several failed attempts to ambush Walker to recover his money and exact revenge.  The People's theory of the case was that Demirdjian decided to rob the victims, leading to their murders, because one of the victims introduced Demirdjian to Walker.  As aptly noted by Judge Noonan of the Ninth Circuit Court of Appeals in adjudicating Demirdjian's prior federal habeas petition, "The prosecution's stated motive for Demirdjian to have committed the murders—a transferred desire for revenge—was risible." (*Demirdjian v. Gipson, supra,* 832 F.3d at p. 1078, diss. opn.)  The majority also conceded "the evidence of motive was weak," and stated "[t]he jury was instructed that the prosecution need not prove motive and that the jury could—but need not—consider a lack of motive as a 'circumstance' that might 'tend to show' Demirdjian was not guilty." (*Id.* at p. 1074.)

16

While there was indisputable evidence tying Demirdjian to the crime scene, it is less than clear as to what actually transpired between Demirdjian, the victims, and others involved in the murders. The prosecutor at trial acknowledged this shortcoming in the evidence and urged a first degree murder conviction if Demirdjian was involved in any manner, as an "actual perpetrator or as a coconspirator or as an aider and abettor or as a participant in a robbery, where the natural consequences [resulted in] this particular killing." The lack of clarity of what happened at the school the night of the murders is amplified by Demirdjian's innocuous interactions with the victims earlier in the evening. Demirdjian was spending time with the victims, playing basketball, and the victims were using his cell phone to chat with family and friends. At one point, one of the victims was talking to his friend on the cell phone and stated they were all scared because people were following them.

The Attorney General references the material discovered on Demirdjian's computer (the poem and photographs) depicting violent acts consistent with how the victims were killed and the brutal nature of the murders to support his conclusion. We are not persuaded. First, the Attorney General fails to articulate, and we are unable to discern, how the brutal nature of the murders supports a finding of premeditation. Rather, it appears to support a "rage killing" as put forth by the prosecution. Second, "we do not view the evidence supporting the valid theory in the light most favorable to the prosecution, but instead consider whether a reasonable jury, given the findings actually made and the state of the evidence, could have found in favor of the defendant." (*In re Ferrell* (2023) 14 Cal.5th 593, 605.) Given the lack of clarity of the evidence, we cannot conclude "any rational

17

jury would have found [Demirdjian guilty of first degree premeditated murder] notwithstanding the error." (See *Lopez, supra,* 14 Cal.5th at p. 582.)

Accordingly, we reverse Demirdjian's first degree murder convictions and remand the matter to the trial court where the prosecution will be allowed to retry the first degree murder charges or accept a reduction of the convictions to second degree murder. (*Chiu, supra*, 59 Cal.4th at p. 168; *In re Cobbs* (2019) 41 Cal.App.5th 1073, 1081.)

## DISPOSITION

The petition is granted. The superior court is directed to vacate the first degree murder convictions with the accompanying special circumstance allegations. The People can elect to retry the murder charge on a currently valid first degree murder theory or accept the reduction of second degree murder. If the People opt not to retry Demirdjian, the superior court is directed to resentence him to second degree murder.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ZUKIN, J.

We concur:

COLLINS, Acting P. J.

MORI, J.

18