Filed 6/7/24  In re Lopez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re JORGE LOPEZ on Habeas Corpus. | C099854 |
| | (Super. Ct. No. 07F01601) |

A jury found petitioner Jorge Lopez guilty of first degree murder in 2008 (Pen. Code, §§ 187, subd. (a)).[1]  (*People v. Lopez* (Feb. 11, 2010, C059074) [nonpub. opn.] (*Lopez I*); *People v. Lopez* (Sep. 24, 2021, C091477) [nonpub. opn.] (*Lopez II*).)  The jury also found true gang and firearm enhancements, including that defendant was a principal in the murder, and a principal intentionally and personally discharged a firearm causing great bodily injury or death to a victim[2] (§§ 186.22, subd. (b)(1), 12022.53, subds. (b), (c), (d), and (e)(1)).  (*Lopez II, supra,* C091477.)  The trial court sentenced petitioner to

---

[1]  Undesignated statutory references are to the Penal Code.

[2] A separate jury found codefendant Luis Fernando Pacheco guilty of the same first degree murder and enhancements.  (*Lopez I, supra,* C059074.)  Another jury heard the evidence against codefendant Luis Garcia; however, a mistrial was declared in that case due to juror misconduct.

1

25 years to life for the murder conviction, plus 25 years to life for one of the firearm enhancements. (*Lopez II, supra,* C091477.) Another panel of this court affirmed the conviction. (*Lopez I, supra,* C059074.)

Petitioner filed a petition for resentencing under former section 1170.95 (now section 1172.6) in 2019. (*Lopez II, supra,* C091477.) The trial court denied the petition at the prima facie stage, and yet another panel of this court reversed. (*Ibid*.) Petitioner then filed a second petition for resentencing, which was denied after an evidentiary hearing. Petitioner has appealed from the denial of the second resentencing petition in *People v. Lopez,* case No. C099099.

Petitioner has also filed the instant petition for habeas corpus, in which he challenges the first-degree murder conviction in light of the California Supreme Court's opinion in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*). The People agree—as do we—that the petition should be granted. We therefore issue the writ of habeas corpus, vacate petitioner's conviction for first degree murder, and remand with instructions to the trial court to permit the prosecution to either retry petitioner on a first-degree murder charge or accept a reduction of the conviction to second degree murder. Because we grant the habeas petition, we will dismiss petitioner's appeal from the denial of his resentencing petition in *People v. Lopez,* case No. C099099 as moot by separate opinion.

## I. BACKGROUND

*A.     Evidence at Trial*[3]

Jose, a member of the Howe Park Surenos, was driving through North Sacramento on the evening of February 5, 2007. He stopped at a traffic signal, and three young men on bicycles approached his car. One of the men produced a gun and began firing. Jose

---

[3] We derive the factual background in this case from the record in *People v. Lopez,* case No. C099099, of which we take judicial notice.

managed to drive away; however, a bullet struck his car's rear window, and Jose was in turn struck in the shoulder with shattered glass.

Jose drove to the home of Juan, another member of the Howe Park Surenos.[4] Other gang members—including Pacheco, Garcia, and petitioner—arrived shortly thereafter. Jose told the group he had been fired upon by three Nortenos in Gardenland, a neighborhood associated with the Nortenos. Pacheco wanted revenge and said, " 'Let's go get them.' "

The group started making plans. They discussed the possibility of driving to Gardenland in a stolen car to avoid recognition. They considered postponing the mission for a couple of days to catch their rivals unaware. They also discussed the need to get a gun. Pacheco and Garcia left the house and returned shortly thereafter.[5]

A group of four men eventually got into Pacheco's car: Pacheco, Garcia, Jose, and petitioner. Jose thought the plan was to seek revenge in a couple of days. He asked Pacheco to drop him off at his girlfriend's house, and Pacheco complied. The remaining men—Pacheco, Garcia, and petitioner—then set out for Gardenland. Petitioner would later tell detectives he did not know for certain whether Pacheco had a gun, but he suspected as much.

Lorenzo, a member of the Varrio Gardenland Nortenos, lived on Bridgeford Drive with his grandfather, Jesse. Lorenzo was walking alone on Bridgeford Drive toward the intersection of nearby Northgate Boulevard on the evening of February 5, 2007. When he reached the intersection, he saw a car slow down and pull over. Three men got out of the car and stood on the other side of Northgate Boulevard, waiting to cross. Lorenzo determined they were Surenos, judging from their clothing and distinctive hairstyles. He

---

[4] To avoid confusion with defendant, we will refer to Juan Lopez by his first name.

[5] Garcia would later testify that they went to buy a gun.

3

saw two or three guns. Lorenzo turned and started running for home. Two of the men crossed Northgate Boulevard and gave chase. A shot was fired. Lorenzo would later say he heard the first shot as the group crossed Northgate Boulevard. He heard four or five more shots in the time it took to reach his front door.

Lorenzo's aunt, Myra, was watching television in the living room that evening with her two children. All of a sudden, Lorenzo ran into the house and yelled for everyone to " 'stay inside the house because they were shooting outside.' " Lorenzo shut the front door and ran upstairs. Myra gathered the children and ran towards the back of the house. Jesse, who had been washing dishes in the kitchen, went to the living room to lock the front door. This would prove to be a fatal mistake.

Officers from the Sacramento Police Department responded to Jesse and Lorenzo's house on Bridgeford Drive. They found Jesse bleeding on the floor. He was transported to the hospital, where he died from a single gunshot wound to the abdomen.

The house also sustained gunfire. Gunshot holes were found in the front door and window. Evidence of gunfire was also found in posts on the front porch. A firearms examiner would later opine that a bullet recovered from Jesse's body was similar to one recovered from a front porch post. He would also opine that at least two guns were responsible for the bullets recovered from the scene.

Pacheco and petitioner spoke with Jose the day after the shooting. They told Jose they were driving around and saw a young Norteno (later identified as Lorenzo) walking down the street. They jumped out of the car, and the Norteno (Lorenzo) turned and ran, ultimately reaching a house and closing the door. Pacheco and petitioner tried to open the door but were unable to do so. They then shot at the door and returned to their car. Jose said Pacheco and petitioner both admitted to shooting at Lorenzo's house.

Detectives investigated and eventually interviewed petitioner. Petitioner admitted that he, Pacheco, and Garcia were all Surenos. He also admitted that all three went to Gardenland that night looking for Nortenos to retaliate against for shooting at Jose earlier

4

that day.  Petitioner admitted chasing Lorenzo and hearing gunshots, but denied having a gun.

B.      *Jury Instructions and Verdict*

The jury was instructed on several theories of liability for murder in the first and second degree.  As relevant here, the jury was instructed on direct aiding and abetting (CALCRIM No. 401), aiding and abetting based on the natural and probable consequences doctrine (CALCRIM No. 403), conspiracy to commit assault with a firearm (CALCRIM No. 416), express and implied malice murder (CALCRIM Nos. 520 and 521) and transferred intent (CALCRIM No. 562).  Thus, as the panel in *Lopez II* explained:  "The jury instructions provided by the court permitted a murder conviction under the natural and probable consequences doctrine with assault with a firearm as the target crime."  (*Lopez II, supra,* C091477.)

We have not received a transcript of the prosecutor's closing argument.  However, the panel in *Lopez II* observed:  "The prosecutor's closing argument . . . asserted defendant could be convicted under a direct aider and abettor theory, as an aider and abettor under the natural and probable consequences doctrine, or as the actual killer." (*Lopez II, supra,* C091477.)  Neither of the court's prior unpublished opinions express any view as to which theory of liability may have been used to convict petitioner.  (*Ibid*.)

C.      *Related Proceedings*

Petitioner filed combined petitions for resentencing and writ of habeas corpus in the trial court in 2019.  The trial court bifurcated the resentencing and habeas corpus issues and denied both forms of relief by order dated January 16, 2020.  With respect to the resentencing issues, the trial court reviewed the court's unpublished opinion in *Lopez I* and found "beyond a reasonable doubt that [petitioner] . . . is <u>not</u> a person who 'could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019,' because a reasonable jury 'could' find, beyond a reasonable doubt, that [petitioner] . . . is guilty of first degree murder based on a

5

direct aiding and abetting theory." Accordingly, the trial court determined petitioner could not state a prima facie case under what was then section 1170.95.

With respect to the habeas corpus issues, the trial court reasoned: "The court has already concluded, above, in denying [petitioner's] . . . § 1170.95 petition, that it is beyond a reasonable doubt that had [petitioner's] . . . jury not been instructed on the natural and probable consequences doctrine, the jury would have convicted [petitioner] . . . of first degree murder, based on a direct aiding and abetting theory." Accordingly, the trial court determined petitioner failed to state a prima facie case for habeas corpus relief.

Petitioner appealed from the denial of the resentencing petition, arguing the trial court should not have denied the petition at the prima facie stage. (*Lopez II, supra,* C091477.) The court agreed, stating: "While it is certainly possible that [petitioner] was convicted on a theory of liability that is still permissible under sections 188 and 189, the mere existence of that possibility does not make [petitioner] ineligible for relief as a matter of law. The fact that evidence supports [petitioner's] conviction on a valid theory does not mean the record conclusively establishes the jury actually relied on that theory, nor does it establish the jury did not rely on a now invalid theory." (*Ibid.*) Accordingly, the court reversed and remanded with instructions to issue an order to show cause and hold an evidentiary hearing. (*Ibid.*)

The trial court held an evidentiary hearing on April 21, 2023, and denied the resentencing petition by order dated July 6, 2023. As relevant here, the trial court found "beyond a reasonable doubt that Petitioner aided and abetted Pacheco in committing at least implied malice murder when Pacheco fired indiscriminately into [Lorenzo and Jesse's] home that Petitioner and Pacheco knew was occupied by at least one person—

6

Lorenzo." Accordingly, the trial court found petitioner was "guilty of murder under a still-valid theory."[6]

Petitioner appealed from the order denying the resentencing petition, and, as mentioned above, we will dismiss that appeal as moot in view of our disposition here. Petitioner has also filed a petition for writ of habeas corpus in this court. We issued an order to show cause, and now grant the petition.

## II. DISCUSSION

Petitioner argues his first-degree murder conviction must be reversed under *Chiu* because the jury was instructed on the natural and probable consequences theory of aiding and abetting and the error was not harmless beyond a reasonable doubt.[7] The People agree, as do we.

" 'There are two distinct forms of culpability for aiders and abettors. "First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' " ' [Citation.] *Chiu* eliminated the latter form of aiding and abetting for first degree murder: '[A]n aider and abettor may not be convicted of first[-]degree premediated murder under the natural and probable

---

[6] The trial court deemed it unnecessary for purposes of the resentencing petition to consider whether the evidence supported a conviction for aiding and abetting express malice murder. (See *People v. Gonzalez* (2023) 87 Cal.App.5th 869, 880 [noting that section 1172.6 "does not contain a mechanism for a trial court to reduce a first[-]degree murder conviction to second degree murder"].)

[7] Petitioner also argues he is entitled to *Chiu* relief because "the only rational view of the evidence shows he could not have had an intent to kill and he was not a major participant who acted with reckless indifference as to Pacheco's spur-of-the moment decision to take out the gun and start firing it at the house." We agree petitioner is entitled to relief for the reasons stated in the text. We express no opinion on whether petitioner's view of the evidence is the only rational one.

consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles.' [Citation.] *Chiu* is retroactive and may be raised, as here, in a petition for writ of habeas corpus." (*In re Lopez* (2023) 14 Cal.5th 562, 579.)

Here, the trial court instructed the jury that petitioner could be convicted of first degree murder under the natural and probable consequences doctrine. Specifically, CALCRIM No. 403 permitted the jury to convict petitioner of first degree murder based on findings that he committed assault with a firearm, and murder was the natural and probable consequence of the assault. (Cf. *People v. Rivera* (2015) 234 Cal.App.4th 1350, 1357 [trial court "erred in instructing the jury it could reach a verdict of first degree murder . . . if it found that the target crime of the uncharged conspiracy was discharging a firearm at an occupied vehicle and that first degree murder was a natural and probable consequence of that target crime"].) The jury was thus not required to find defendant acted with premeditation and deliberation to find him guilty of first degree murder. The People appropriately concede this was *Chiu* error, and we accept the concession.

The People also concede the error was not harmless. Here, too, the concession is well-taken. "Where a jury is instructed on alternate theories of liability, one legally valid and one legally invalid, a federal constitutional error has occurred. The defendant has been deprived of his or her right to 'a jury properly instructed in the relevant law.' [Citations.] The error therefore requires reversal unless we determine the error was harmless beyond a reasonable doubt." (*In re Lopez, supra,* 14 Cal.5th at p. 580; see also *Chapman v. California* (1967) 386 U.S. 18, 24.)

To determine harmlessness, "[a] reviewing court must determine whether any rational jury would have found the defendant guilty based on a valid theory if the jury had been properly instructed. 'The reviewing court examines what the jury necessarily did find and asks whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well.' [Citation.] In other words, if ' "[n]o reasonable jury that made all of these findings could have failed to find" ' the facts

8

necessary to support a valid theory, the alternative-theory error was harmless." (*In re Lopez, supra,* 14 Cal.5th at pp. 584-585.) The People bear the burden of showing the error was harmless beyond a reasonable doubt. (*Id.* at p. 585.)

We cannot say the error here was harmless beyond a reasonable doubt. It is true, of course, that the jury could have found petitioner guilty of first degree murder as a direct aider and abettor, as the prior panel recognized in *Lopez II.* (*Lopez II, supra,* C091477.) But that is not the question before us today. Instead, we must determine whether, based on the evidence at trial, it would have been impossible for a reasonable jury to find petitioner guilty of first degree murder without also finding that he committed the murder as a direct aider and abettor. (*In re Lopez, supra,* 14 Cal.5th at p. 568.) This we cannot do.

Accordingly, we reverse petitioner's first-degree murder conviction and remand the matter to the trial court where the prosecution will be allowed to retry the first-degree murder charge under a direct aiding and abetting theory or accept a reduction of the conviction to second degree murder. (*Chiu, supra,* 59 Cal.4th at p. 168; *In re Cobbs* (2019) 41 Cal.App.5th 1073, 1081.)

## III.  DISPOSITION

The petition for writ of habeas corpus is granted.  The first-degree murder conviction is vacated, and the matter is remanded to the trial court to permit the prosecution to either retry petitioner on a first-degree murder charge or accept a reduction of the conviction to second degree murder.


/S/

_____

RENNER, J.


We concur:


/S/

_____

ROBIE, Acting P. J.


/S/

_____

BOULWARE EURIE, J.